**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

SHARON K. DEVANEY, :

                Plaintiff,

    -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

                Defendant. :

Case No. 3:10-cv-426

District Judge Timothy S. Black
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988);  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978);  *Houston v. Secretary of Health and Human Services*, 736 F.2d 365  (6th Cir. 1984);  *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984).  However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.  *Garner, supra.*  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion.  *Elkins v. Secretary of Health and Human Services*, 658 F.2d  437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423.  To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy.  42 U.S.C. §423(d)(2).

The Commissioner has established a sequential evaluation process for disability determinations.  20 C.F.R. §404.1520.  First, if the claimant is currently engaged in substantial

gainful activity, the claimant is found not disabled.  Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments;  if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1. If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded.  20 C.F.R. §404.1520(d).  Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment;  if not, the claimant is found not disabled.  Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform.  *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSD on June 28, 2004, alleging disability from November 30, 2001, due to chronic fatigue syndrome, fibromyalgia, irritable bowel, diabetes, depression, panic attacks, chest pain, arthritis, and carpal tunnel syndrome.  (Tr.58-68; 84).  The Commissioner denied Plaintiff's application initially and on reconsideration.  (Tr. 41-44; 46-48). Administrative Law Judge Melvin Padilla held a hearing, (Tr. 518-48), following which he determined that Plaintiff is not disabled.  (Tr. 14-32).  The Appeals Council denied Plaintiff's request for review, (Tr. 6-9), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Padilla found that she has severe obesity, degenerative joint disease affecting both knees likely related to her obesity, mild obstructive

3

sleep apnea, chronic complaints of fatigue and tiredness associated with her obesity and poor sleep habits, diabetes mellitus, and a somatoform disorder, but that she does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 21, ¶ 3, Tr. 24, ¶ 4). Judge Padilla also found that Plaintiff has the residual functional capacity to perform a limited range of light work. (Tr. 25, ¶ 5). Judge Padilla then found that Plaintiff is able to perform her past relevant work as an office manager. (Tr. 30, ¶ 6). In the alternative, Judge Padilla found that using sections 202.20 through 202.22 (prior to age fifty), 202.12 through 202.15 (between ages fifty and fifty-four), and 202.07 and 202.08 (since attaining age fifty-five) as a framework for deciding, coupled with the testimony of a vocational expert (VE), there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 31, ¶ 10). Judge Padilla concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 32).

Plaintiff has a history of several medical conditions including non-alcoholic steatohepatitis, (Tr. 155), adult onset diabetes mellitus, (Tr. 454; 424), and obesity. (Tr. 443, 494).

Plaintiff was hospitalized October 2-4, 2000, after complaining of chest pain, nausea, diaphoresis, and shortness of breath. (Tr. 168-81). Plaintiff's cardiologist, Dr. Karabatak, treated her with medications and she was discharged with the diagnoses of coronary artery disease, first diagonal seventy percent ostial lesion with borderline thallium stress test, hypertension, diabetes mellitus, urinary tract infection, and history of chronic fatigue syndrome. *Id.*

The record contains Dr. Rorrer's clinical notes dated September 1-November 26, 2001, which reveal that Dr. Rorrer treated Plaintiff for various medical conditions including anxiety, seizure disorder, chronic fatigue syndrome, polymyalgia, vertigo, depression, obesity, and diabetes. (Tr. 209-19).

Plaintiff's clinical notes dated December 17, 1997, to July 30, 2001, from the Swope Family Practice are in the record and reveal that Plaintiff received treatment from the physicians in that practice for various medical conditions including diabetes, fibromyalgia, and chronic fatigue syndrome. (Tr. 245-94). .

In July, 2001, Plaintiff began receiving treatment from Dr. Fisco who noted that Plaintiff complained of chronic fatigue and pain. (Tr. 421-59; 473-76; 505). In April, 2005, Plaintiff reported to Dr. Fisco that she was experiencing left knee pain and a subsequent MRI revealed a medial meniscal tear, dry compartmental osteophytosis, high grade chondromalacia medial tibiofemoral compartment, synovitis, minimal superficial infrapatellar bursitis, some mild degeneration of the anterior and posterior cruciate ligaments, and a mechanics-related strain pattern at the medial cruciate ligament. *Id.* In January, 2007, Dr. Fisco reported that Plaintiff had several symptoms of chronic fatigue including unexplained and persistent fatigue, muscle pain, multi-joint pain without joint swelling or tenderness, un-refreshing sleep, post-exertional malaise, poor concentration, cognitive difficulty, and inability to ambulate effectively. *Id.* Dr. Fisco opined that Plaintiff was not able to work for more than one hour a day, was able to stand for sixty minutes in an eight-hour day and for fifteen minutes without interruption, sit for two hours in an eight-hour day and for thirty minutes without interruption, and lift up to five pounds occasionally. *Id.*

Examining psychologist Dr. Flexman reported on September 7, 2004, that Plaintiff completed high school in regular education, completed an office manager course and received a certificate, she was relaxed and did not display any gait disturbances, her facial expressions and general body movements were normal, her speech was normal, and she did not display any pain behaviors. (Tr. 386-89). Dr. Flexman also reported that Plaintiff's affect was appropriate with no

5

lability, her attitude was within normal limits, her mood was normal, she was oriented, her attention span and concentration were good, her intellectual functioning was average, her reliability was good and did not suggest malingering or distortion, her memory was good, her judgment was fair, and that she displayed obsessive thinking concerning somatic or other psychological problems that were judged to be out of proportion with reality with somatization present. *Id.* Dr. Flexman identified Plaintiff's diagnoses as undifferentiated somatoform disorder and depression NOS and he assigned her a GAF of 65. *Id.* Dr. Flexman opined that Plaintiff had normal abilities to understand, remember, and carry out simple instruction, to make judgments for simple work-related decisions, and a moderately impaired ability to respond appropriately to work pressures, and that she had slight difficulties with sustained attention and interacting with others. *Id.*

Plaintiff consulted with orthopedist Dr. Dunaway in May, 2005, who reported that Plaintiff had fairly exquisite tenderness to palpation, popping, clicking, catching, locking, mild give way when walking, and swelling. (Tr. 404-11). Dr. Dunaway performed an arthroscopic partial meniscectomy in June, 2005, and subsequently reported that Plaintiff's progress was stable although she had some ongoing synovitis which he treated with corticosteroid injections on two occasions. *Id.*

In August, 2005, Plaintiff underwent a sleep study which revealed an obstructive sleep apnea with severe oxygen desaturation and the evaluating physician recommended that Plaintiff undergo CPAP treatment, lose weight, and improve her sleep hygiene. (Tr. 406-07).

Plaintiff consulted with rheumatologist Dr. Maciute in September, 2005, at which time Dr. Maciute reported that Plaintiff had trace synovitis over the second and third finger and hand joints and mild swelling of her knees. (Tr. 416-25). Dr. Maciute reported that Plaintiff's fatigue,

tiredness, and aching could be associated with chronic poor sleep and recommended that Plaintiff lose weight. *Id.* Dr. Maciute also reported that Plaintiff might have inflammatory arthritis. *Id.* Plaintiff continued to treat with Dr. Maciute and in late September, 2005, he reported that Plaintiff had lost six and one-half pounds, that she had trace swelling over the MCPs and PIPs with slight tenderness of her wrists, and he identified her diagnosis as inflammatory arthritis. *Id.* Dr. Maciute noted in November, 2005, that Plaintiff complained of side-effects from a medication and he replaced it with another. *Id.*

Dr. Dunaway reported in March, 2006, that Plaintiff complained of increased pain in her right knee and he noted that she was fairly tender to palpation over the medial joint line and that x-rays showed no fracture but revealed mild degenerative arthritis with some early joint space narrowing and peripheral osteophyte formation. (Tr. 470-72). Dr. Dunaway injected Plaintiff's knee. *Id.* In April, 2006, Dr. Dunaway reported that Plaintiff had a fair amount of tenderness to palpation over the medial joint line of her right knee and he noted that Plaintiff had experienced only minimal improvement with the previous injection. *Id.*

The record contains Plaintiff's mental health treatment notes from Red Oak Counseling where she received counseling services from a social worker during the period October 3, 2007, to January 16, 2007. (Tr. 507-11). Those records, which are primarily recitations of Plaintiff's subjective complaints, reveal that Plaintiff received counseling for depression. *Id.*

Examining physician Dr. Vitols reported in January, 2007, that Plaintiff presented with a very slow and stiff gait, had some obvious difficulty transferring from seated to standing and getting off and on the exam table, exhibited multiple areas of tenderness in the cervicodorsal junction and upper dorsal segments of the spine, and that she had tenderness of both SI joints and

greater trochanteric areas. (Tr. 492-503). Dr. Vitols also reported that Plaintiff's sternoclavicular junction was tender anteriorly as were both knees anteriorly, her elbows were tender, she had painful and unrestricted range of motion within the cervical spine, both her shoulders were globally tender, with relative weakness of 4/5 right and left, she had weakness of grip and pinch both right and left, arthritic nodules in the DIP and PIP joints of both hands that were tender to palpation, and that she had painful and restricted motion of the dorsolumbar spine with significant pain over the right SI joint. *Id.* Dr. Vitols noted that Plaintiff had reduced ranges of spinal motion, that she was not able to perform heel and toe standing satisfactorily, could not bear weight independently on either leg, her reflexes were sluggish, both of her knees were tender with patellofemoral crepitus and painful flexion arc right and left, and that both her ankles were globally tender. *Id.* Dr. Vitols also noted that Plaintiff's diagnoses were hypothyroidism, depression, coronary artery disease, diabetes, hypertension, tricompartmental osteoarthritis right and left knee, exogenous obesity, sleep apnea, and fibromyalgia with chronic fatigue syndrome. *Id.* Dr. Vitols opined that Plaintiff presented with a combination of impairments that prevented her from engaging in substantial gainful activities on a regular competitive basis, that she met and exceeded Listing 1.02A, had major dysfunction of two major weight-bearing joints, and that she was not able to engage in any physical activities on a sustained level. *Id.* Dr. Viols also opined that Plaintiff was able to lift/carry two to three pounds occasionally, stand for two hours in an eight-hour day and for one-quarter hour without interruption, sit for four hours in an eight-hour day and for one-half hour without interruption, and that she was not able to perform medium, light, or sedentary work. *Id.*

Plaintiff alleges in her Statement of Errors that the Commissioner erred by failing to give the proper evidentiary weight to Dr. Fisco's opinion, by improperly evaluating her complaints

of pain and fatigue, and by improperly evaluating her mental impairment. (Doc. 8).

In support of her first Error, Plaintiff argues that the Commissioner erred by failing to properly evaluate Dr. Fisco's opinion about her residual functional capacity.

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards." *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009). "One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations."

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), *quoting,* 20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley,* 581 F.3d at 406*, quoting, Wilson,* 378 F.3d at 544*.* "On the other hand, a Social Security Ruling[1] explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and

---

FN 1. Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

9

laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 582 F.3d at 406, *citing, Wilson,* 378 F.3d at 544, *citing* 20 C.F.R. § 404.1527(d)(2).

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07, *citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Blakley,* 581 F.3d at 407, *citing, Wilson,* 378 F.3d at 544. "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an

10

ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

In declining to give Dr. Fisco's opinion controlling or even great weight, Judge Padilla determined that it is not supported by Dr. Fisco's clinical notes and is inconsistent with other evidence in the record. (Tr. 27). This Court cannot say that the Commissioner erred in this regard.

Although Dr. Fisco essentially opined that Plaintiff's residual functional capacity is inconsistent with the ability to perform substantial gainful activity, a review of his clinical notes reveals that they do not support that conclusion. First, Plaintiff initially saw Dr. Fisco only occasionally. For example, Plaintiff received treatment from Dr. Fisco on July 30, 2001, but not again until December, 2003. Subsequently, Plaintiff received treatment from Dr. Fisco on a more frequent basis, but his clinical notes contain few, if any objective findings. Indeed, Dr. Fisco's records reveal that he most often indicated that Plaintiff's physical examination was normal.

Dr. Fisco's opinion is also inconsistent with other evidence. For example, orthopedic surgeon Dr. Dunaway determined that Plaintiff's progress post-arthroscopic surgery was stable. Although Dr. Dunaway noted that Plaintiff had some ongoing synovitis, he treated that with medications and injections, and noted that she had only "a fair amount" of tenderness. Nowhere did Dr. Dunaway opine that Plaintiff was impaired in her ability to work nor that she required ambulatory aids. In addition, Dr. Manciute, a rheumatologist reported that Plaintiff had, at worst, trace synovitis in her hands, mild swelling of her knees, and slight tenderness of her wrists. Finally,

11

Dr. Fisco's opinion is inconsistent with the reviewing physicians' opinions. See Tr. 380-85.

While Dr. Vitols' opinion arguably supports Dr. Fisco's opinion, the issue, of course, if whether the Commissioner's decision is supported by substantial evidence. Moreover, Dr. Vitols is a one-time examining physician whose opinion is, like Dr. Fisco's, inconsistent with the evidence from Plaintiff's other treating and consulting physicians.

Under these facts, the Commissioner did not err by rejecting Dr. Fisco's opinion about Plaintiff's residual functional capacity.

Plaintiff argues next that the Commissioner erred by evaluating her complaints of pain and fatigue.

In many disability cases, the cause of the disability is not necessarily the underlying condition itself, but rather the symptoms associated with the condition. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 247, (6th Cir. 2007). Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. *Rogers, supra* (citations omitted). First, the ALJ will ask whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. *Id.* (citation omitted). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities, *Id.* Stated differently, there is a two-step process for evaluating pain. First, the individual must establish a medically determinable impairment which could reasonably be expected to produce the pain. *See, Jones v. Secretary of Health and Human Services,* 945 F.2d 1365 (6th Cir. 1991), *citing, Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir. 1986). Second, the intensity and persistence of the

12

alleged pain are evaluated by considering all of the relevant evidence. *See, Jones,* 945 F.2d at 1366-70.

In rejecting Plaintiff's allegations of disabling pain and fatigue, Judge Padilla essentially determined that those allegations are not supported by the evidence. (Tr. 27-29). This Court agrees. Specifically, for the same reasons that the Commissioner had an adequate basis for rejecting Dr. Fisco's opinion, the Commissioner did not err by rejecting Plaintiff's subjective complaints and allegations.

The Court notes that the Sixth Circuit has recognized that fibromyalgia can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 243, (6th Cir. 2007), citing *Preston v. Secretary of Health & Human Services,* 854 F.2d 815, 820 (6th Cir. 1988)(per curiam). Fibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion. *Rogers, supra.* The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials. *Id.* (citation omitted).

Although there is suggestion in the record that Plaintiff has fibromyalgia/chronic fatigue syndrome, there is no indication that Plaintiff has been subjected to the process of diagnosing fibromyalgia that the Sixth Circuit has described. In other words, there is no documentation whatsoever in the record of testing the series of focal points for tenderness nor the ruling out of other possible conditions to which Plaintiff's complaints could be attributed. In the absence of this acceptable process of diagnosing fibromyalgia, the Commissioner was not required to accept as

entirely true Plaintiff's complaints and allegations of disabling symptoms in the absence of clinical findings.

Plaintiff's final argument is that the Commissioner erred by failing to properly evaluate her mental impairment.

In determining that Plaintiff is precluded from performing stressful jobs per the Dictionary of Occupational Title, *i.e.,* no jobs involving inherently dangerous or hazardous activities, Judge Padilla relied on Plaintiff's treatment notes from Red Oak Counseling as well, in part, on Dr. Flexman's report and opinion. (Tr. 27-28).

As Judge Padilla noted, Plaintiff's Red Oak treatment notes reveal that generally, Plaintiff's mood was controlled and she did not exhibit any serious mental health-related symptoms. (Tr. 505-11). Moreover, Dr. Flexman reported essentially normal findings and he assigned her a GAF of 65 indicating, at worst, "some" difficulties in functioning.

In spite of reporting generally normal findings and determinating that Plaintiff has only some difficulties in functioning, Dr. Flexman opined that Plaintiff had a moderately impaired ability to respond to work pressures. Plaintiff's position is that this limitation precludes her from performing her past relevant work. However, Dr. Flexman's opinion on that issue is inconsistent with his clinical findings as well as with his conclusion that Plaintiff's GAF is 65. Therefore, the Commissioner was not required to give that portion of Dr. Flexman's opinion great weight.

The Court's duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a

14

verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

August 22, 2011                                        s/ **Michael R. Merz**
                                                                United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).